UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JACKIE MCGEE,

                Plaintiff,

      v.                                            Case No. 21-cv-1184-bhl

BILLY PONTOW, et al.,

                Defendants.

## DECISION AND ORDER

Plaintiff Jackie McGee, a Wisconsin state prisoner who is representing himself, is proceeding on Eighth and Fourteenth Amendment claims in connection with allegations that Defendants Billy Pontow, Alexander Rasmussen, James Cousineau, and Trinity Eager forced him to work as a janitor in a portion of the prison housing COVID-19 positive inmates without taking reasonable precautions, including providing him with appropriate Personal Protective Equipment (PPE), to ensure he would not catch the virus. Dkt. No. 11. This matter comes before the Court on the parties' cross-motions for summary judgment and on McGee's motion for extension of time. Dkt. Nos. 42, 51, & 53. Because Defendants took reasonable precautions to prevent McGee from catching COVID-19 and had a rational basis for allocating PPE among janitors, the Court will grant Defendants' motion for summary judgment, deny McGee's motion for summary judgment, and dismiss the case.

## PROCEDURAL BACKGROUND

McGee filed this case on March 25, 2021 in the Western District of Wisconsin. *See* Dkt. No. 1. After screening the complaint, that Court granted Defendants' motion to transfer venue to

this district on October 13, 2021. Dkt. No. 30. This Court then entered a scheduling order setting a discovery deadline of March 21, 2022; and a dispositive motions deadline of April 19, 2022. Dkt. No. 34.

## MOTION FOR EXTENSION OF TIME

On April 28, 2022, McGee moved for an extension of the summary judgment deadline. Dkt. No. 51. He explained that he had timely placed his motion for summary judgment in the institution's mailroom on April 18, 2022, but someone working in the mailroom failed to mail the document. *Id*. The mailing was returned to him on April 22, 2022 with a request for another disbursement form, which he immediately re-submitted. *Id*. Because circumstances beyond McGee's control caused the delay in his filing, McGee's explanation satisfies excusable neglect and his motion, which Defendants do not oppose, will be granted. *See* Fed. R. Civ. P. 6(b)(1)(B); *see also Bowman v. Korte*, 962 F.3d 995, 998 (7th Cir. 2020) (noting that, to acquire an extension of time *after* a deadline has passed, a party must show "excusable neglect" for the untimely request.)

## UNDISPUTED FACTS

At the relevant time, McGee was an inmate at the Fox Lake Correctional Institution, where Pontow, Rasmussen, Cousineau, and Eager were correctional officers. Dkt. No. 44, ¶¶1-10.

In 2020, the COVID-19 pandemic was spreading throughout the nation and world, including in Wisconsin prisons. From the time the pandemic began, Fox Lake implemented a variety of practices to help slow the spread of the virus including, a mask-wearing policy, limiting movement in the institution, excluding outside visitors, encouraging inmates to seek treatment if they were experiencing symptoms, and increased sanitation. *Id*., ¶¶26, 34. Until October 2020, Fox Lake appears to have been "very successful in keeping the virus out of the institution." Dkt.

No. 1-2. But the institution started to face growing challenges due to "off ground" medical trips and scheduled intakes. *Id*. Specifically, there were not enough quarantine beds to accommodate all the inmates who had to go "off ground" for necessary medical treatments, court proceedings, new intakes, and/or other similar circumstances. *Id*. In a memorandum dated October 5, 2020, Programs Supervisor Captain Landaal explained that additional "precautionary measures" were being implemented for everyone's safety as soon as possible, including increasing quarantine capacity from 41 beds to 82 beds and turning A and B wings into "designated" quarantine wings for inmates who tested positive for the virus. *Id*.; *see also* Dkt. No. 1, ¶26; *see also* Dkt. No. 44, ¶32.

Later that month, in October 2020, inmates in need of quarantine were moved to A and B wings. Dkt. No. 1, ¶26; *see also* Dkt. No. 44, ¶32. The facility implemented additional "quarantine" procedures, including requiring mask-wearing at all times when out of assigned rooms (including no eating or drinking outside of the assigned room); keeping doors closed at all times except when entering and exiting an assigned room; no loitering in common spaces along with social distancing when social interaction was unavoidable; specific procedures to limit contact during the delivery of meal trays/medication/hygiene products to assigned rooms; protective barriers on high-touch spaces coupled with increased sanitation on high-touch spaces; no sharing of personal property; and limiting communication with staff to interview request slips. Dkt. No. 1-6. Inmates who did not need to quarantine moved to C and D wings. Dkt. No. 1, ¶27. McGee moved to C wing at that time and worked as a janitor. *Id*., ¶¶27, 31.

About a month later, in November 2020, Fox Lake conducted another COVID-19 test for inmates housed in C and D wings. Dkt. No. 44, ¶13. Inmates who tested positive were placed in "isolation" in C wing; inmates who tested negative were moved to D wing. *Id*., ¶14. McGee tested

negative, so he moved to D wing on or around November 17, 2020. *Id*., ¶¶15, 22; Dkt. No. 55 at 19, ¶4. At that time, about 41 inmates were housed in D wing and the institution implemented additional procedures including, increased disinfection of high-touch spaces, increased social distancing, and staggered dayroom hours. Dkt. No. 44, ¶16; *see also* Dkt. No. 1-7.

The dispute in this case involves a three-week time period, between November 17, 2020 and December 3, 2020, when McGee continued his job as a janitor on C wing despite his move to D-wing. As a part of his job, McGee had to fill chemical bottles located inside the supply closet in both C wing and D wing. Dkt. No. 44, ¶¶17-18; *see also* Dkt. No. 55 at 19, ¶6. A correctional officer (either Rasmussen, Cousineau, or Eager depending on the day/shift) would accompany McGee as he did this task; the correctional officer would unlock the door between the two units and the supply closet. Dkt. No. 44, ¶¶61-62, 71, 86-87. McGee had to walk through the dayroom to the bathroom where the supply closet was located. *Id*., ¶88. McGee explains that the inmates in C wing could just walk around the dayroom and bathroom while he was there. Dkt. No. 55 at 20, ¶¶10, 12-13. Once inside the bathroom, it took about five to seven minutes to fill the chemical bottles. Dkt. No. 44, ¶¶73, 89. McGee did this task each day between 3-4 p.m. and 3-4 a.m. *Id*., ¶19. McGee had a cloth facemask, gloves, and sanitation supplies to do his job, *see id*., ¶¶28, 33, 66, 75, but he did not have other more specialized PPE because supplies at the institution were limited and the janitors on A and B wings had priority, *id*., ¶¶32, 95. McGee was not required to clean anything or interact with anyone as a part of his janitorial duties—his job was limited to filling chemical bottles. Dkt. No. 1-4 at 1. For this reason, the institution provided its limited numbers of N95 masks and face shields to the janitors on A and B wings who had to clean surfaces and deliver meal trays as it deemed them in greater need of extra-precaution. *Id*.

On November 21, 2020, about four days after moving to D wing, McGee told Pontow that he wanted to quit his job as a janitor because he was afraid of catching COVID-19 due to his pre-existing medical conditions, including his old age (60), arthritis, and liver damage from Hepatitis-C. Dkt. No. 55 at 23, ¶23. McGee also told Pontow that janitors on A and B wings had PPE and he wanted that policy to apply to him as well. *Id*. at 21-22, ¶¶17-22. Pontow responded in a loud voice, "I will put you on VUNA right now! Do your job!" *Id*. at 23, ¶¶24-26. Pontow allegedly "made it clear to [McGee] that he still expected [McGee] to do his job on C-wing and D-wing." *Id*. at 19, ¶5. McGee was never provided with an N95 mask, face shield, or other PPE. *Id*. at 21-22, ¶¶17-22.

Pontow explains that "VUNA status" is a status applicable to all inmates who quit their prison jobs. Dkt. No. 44, ¶¶42-45. An inmate on VUNA status is not compensated for a minimum of 90 days. *Id*. The VUNA policy is intended to discourage inmates from quitting their jobs and has been in place since before the pandemic. *Id*., ¶¶45-46. Pontow disputes that he ever threatened McGee to force him to continue working. *Id*., ¶43. It was McGee's decision whether to quit his job or continue working as a janitor. *Id*. The other defendants (Rasmussen, Cousineau, and Eager) state that they don't recall ever speaking to McGee about job-related or COVID-19-related concerns. *Id*., ¶¶ 63-64, 74, 77, 96. They also state that they never forced McGee to work. *Id*., ¶¶56, 79, 91. And they had no authority to give McGee PPE, even if he had asked. *Id*., ¶¶67, 76, 94.

On December 1, 2020, McGee tested positive for COVID-19, and two days later, was moved to C wing. *Id*., ¶¶21, 23, 51. McGee states that, after he caught COVID-19, he learned that the institution's Security Director had issued a memo on November 18, 2020 notifying staff that "all wings will operate independent of each other," meaning McGee should not have been

5

going back and forth between C and D wings to fill chemical bottles as a part of his job. Dkt. No. 54, ¶9.

According to Defendants, the institution tried to isolate positive inmates, but this was not always possible. Dkt. No. 44, ¶27. They did their best to follow the institution's COVID-19 guidelines, but there was no foolproof way to prevent all inmates from catching the virus. *Id*., ¶¶29-31, 35. Despite best efforts to isolate and quarantine infected inmates and implement mitigation measures, COVID-19 was actively circulating in D wing while McGee was housed there prior to him contracting the virus; for example, 29 other D wing inmates tested positive on or around November 17 and December 3. *Id*., ¶¶24-25.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party asserting that a fact is genuinely disputed must support the assertion by:

  (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

  (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

6

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

Defendants argue that they are entitled to summary judgment for several different reasons. With respect to McGee's Eighth Amendment claim, Defendants argue that McGee could have quit his job as a janitor at any time to limit his exposure to COVID-19 on C wing. They also insist that they responded appropriately to the risks posed by the virus by implementing procedures to stop the spread of the virus at the institution generally, and, more specifically, by giving McGee a mask, gloves, and sanitation supplies to do his job in C wing. And they argue that §1983 at bottom is a tort claim and McGee cannot prove that working as a janitor on C wing caused his injury. With respect to McGee's Fourteenth Amendment claim, Defendants argue that McGee cannot prove discriminatory intent. They assert that there was a rational basis for allocating PPE to the janitors on A and B wings who had to clean surfaces and had potential for more interaction with infected inmates.

**I.  No Reasonable Jury Could Conclude that Defendants Failed To Take Reasonable Precautions To Prevent McGee From Contracting COVID-19**

To survive summary judgment on an Eighth Amendment conditions-of-confinement claim, McGee must present evidence from which a reasonable jury could conclude that: (1) he was exposed to conditions that created an excessive risk to his health and safety; and (2) defendants were subjectively aware of these conditions and refused to take reasonable steps to correct them. *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).

With respect to the first prong, at least three district courts in this circuit have concluded that placing a healthy inmate in circumstances where they could not socially distance from unhealthy inmates could pose a substantial risk of harm to health or safety. *See e.g. Griffin v. Knight*, No. 121CV00038TWPTAB, 2023 WL 1363317, at *3 (S.D. Ind. Jan. 31, 2023) ("[P]lacing [plaintiff] in close quarters in a dining room with a group of inmates where they could not socially distance posed a substantial risk of harm…"); *see e.g. Wells v. Wexford of Indiana LLC*, No. 1:20-CV-03086-TWP-MG, 2022 WL 4367436, at *6 (S.D. Ind. Sept. 20, 2022) ("[P]lacing [plaintiff] in close quarters in a gym with a group of inmates who were not confirmed to have COVID-19 but were symptomatic posed a substantial risk of harm…"); *see e.g. Stewart v. Haese*, No. 20-CV-1494, 2022 WL 1750523, at *3 (E.D. Wis. May 31, 2022). Whether this was an "excessive" risk, in the context of operating a prison in the midst of a worldwide pandemic is a close question. Prison administrators had an extremely challenging task in balancing the need to maintain a secure prison facility while fighting the spread of COVID-19. The Seventh Circuit has long cautioned Courts against second-guessing prison officials' judgments. *Bell v. Wolfish,* 441 U.S. 520, 545 (1979). The Court need not resolve this issue, and will assume for purposes of summary judgment that McGee has satisfied this element, because the record defeats his claim for a different reason.

With respect to the second prong of a conditions-of-confinement claim, the Seventh Circuit has directed district courts to review the "totality of the facts and circumstances" when evaluating the reasonableness of prison officials' responses to the pandemic. *Mays v. Dart*, 974 F.3d 810, 819-20 (7th Cir. 2020). District courts should not consider the response to the pandemic "in a vacuum." *Id*. at 820. "[W]hen evaluating reasonableness…courts must afford prison administrators wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional

8

security." *Id.* (quoting *Henry v. Hulett*, 969 F.3d 769, 783 (7th Cir. 2020)). "Correctional administrators must have 'substantial discretion to devise reasonable solutions to the problem they face,' particularly when safety and security interests are at stake.'" *Id.* (quoting *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012)).

Deliberate indifference is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008). The question is whether Defendants "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Defendants insist that none of them unreasonably acted to expose McGee to COVID-19. With respect to Rasmussen, Cousineau, and Eager, it is undisputed that McGee never spoke to them about his job-related or COVID-19-related concerns and they did not have the authority to give him PPE, even if he had asked. Dkt. No. 44, ¶¶63-64, 67, 74, 76-77, 94, & 96; *see also* Dkt. No. 55 at 18-25. A prison official who does not know about a prisoner's concern cannot be deliberately indifferent towards it. *See Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009).

As for McGee's claim that he was "forced" to continue to serve as a janitor on C wing, Defendants insist McGee could have quit his job at any time. Dkt. No. 44, ¶¶42-45. McGee disputes this, claiming that Pontow "threatened" him and "made it clear" that he wanted McGee to continue working. Dkt. No. 55 at 23, ¶¶24-27. The Court need not resolve this dispute (which would apply only to McGee's claims against Pontow), because the record confirms that no reasonable jury could find that Defendants refused to take reasonable precautions to prevent McGee from contracting the virus.

The record contains ample evidence showing Defendants' efforts to stop the spread of COVID-19 at the institution. These efforts included routine COVID-19 screening and testing, multiple designated quarantine and isolation zones, a mask-wearing policy, limiting movement within the institution, specific procedures to limit in-person contact within the institution, protective barriers on high-touch spaces coupled with increased sanitation on high-touch spaces, no sharing of personal property, staggered dayroom hours, excluding outside visitors, encouraging inmates to seek treatment if they were experiencing symptoms, and having increased access to sanitation supplies. With respect to McGee's job in C wing specifically, he had access to a cloth facemask, gloves, and sanitation supplies. Given that McGee was only in C wing two times a day for a total of 5 to 7 minutes at a time, a cloth facemask, gloves, and sanitation supplies were reasonable precautionary measures. Although McGee claims that his cloth facemask was ill-fitting and PPE would have been better, Defendants were not required to provide "the best possible option." *See Shipp v. Lobenstein*, No. 21-CV-167-JDP, 2022 WL 2438620, at *7 (W.D. Wis. July 5, 2022). They were required to provide reasonable precautions, which they did.

McGee argues that Defendants failed to follow the Security Director's November 18 memo that explicitly stated, "all wings will operate independent of each other." He states that Defendants should have realized the mistake they made each time they took him from D wing to C wing to do his job. A violation of an internal prison policy alone does not violate the Constitution, *see Shipp*, 2022 WL 2438620, at *5 (citing *Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017), and in light of the totality of the other precautions implemented at the institution, Defendants' failure to catch that one error amounted to negligence, not deliberate indifference. *See e.g. Mays*, 974 F.3d at 820 (reversing a district court's finding that COVID-19 measures were "unreasonable" because the court's decision relied on "one, and only one, key factual finding" and did not consider

10

Case 2:21-cv-01184-BHL   Filed 02/17/23   Page 10 of 13   Document 62

"the totality of the measures [Defendant] already had taken to combat the spread of COVID-19."). Indeed, the record as a whole shows that Fox Lake and the defendants in this case did their best to prevent all inmates, including McGee, from getting infected with the virus at the institution.

McGee's claim also fails on causation grounds. There is no dispute that McGee was exposed to inmates who had COVID-19 each time he went to C wing as a part of his job duties. But he was also likely exposed to inmates who had COVID-19 in the D wing. For McGee to prevail on his claim, he must *prove* that he contracted COVID-19 as a result of his janitorial trips to the C wing. As the Seventh Circuit has held, "there is no tort without an actionable injury *caused by* the defendant's wrongful act." *Fields v. Wharrie*, 740 F.3d 1107, 1111 (7th Cir. 2014) (emphasis added.) This is true "even in the field of constitutional torts." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982); *see also Boyd v. Reaves*, No. 120CV01844TWPTAB, 2022 WL 4217352, at *5 (S.D. Ind. Sept. 13, 2022). Fox Lake was spared of COVID-19 for most of 2020, but when the virus eventually arrived at the institution, it spread rapidly. Within two months, three out of the four prison wings were either quarantine or isolation zones. McGee has no proof beyond pure conjecture that he caught COVID-19 during his janitorial trips to the C wing. Because the evidence he has martialed to support his claim would require a finder of fact to engage in speculation, he has not satisfied his summary judgment burden. *See Weaver v. Champion Petfoods USA Inc.,* 3 F.4th 927, 936 (7th Cir. 2021) ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion."). Accordingly, Defendants are entitled to summary judgment on the Eighth Amendment claim.

**II.  Defendants Had A Rational Basis For Allocating PPE to Janitors Who Worked On A and B Wings**

The Fourteenth Amendment protects inmates from invidious discrimination. *Lisle v. Welborn*, 933 F.3d 705, 719 (7th Cir. 2019). Inmates must allege that "defendants

11

intentionally treated him differently because of his race…ethnicity, sex, religion, or other proscribed factor…" *Id.* at 719–20. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). McGee does not allege that race or any other classification subject to heightened scrutiny caused the discrimination, but prison officials must still have a rational basis for treating persons differently. *See e.g. Blake v. Perttu*, No. 21-CV-197-JDP, 2022 WL 17415059, at *2 (W.D. Wis. Dec. 5, 2022). To survive summary judgment on a "class-of-one" claim, McGee must present evidence from which a reasonable jury could conclude: (1) Defendants intentionally treated him differently from others similarly situated; and (2) this different treatment was not rationally related to a legitimate state interest. *Smith v. City of Chicago*, 457 F.3d 643, 650–51 (7th Cir. 2006); *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

The summary judgment record shows that McGee was not similarly situated to the janitors on A and B wings and that there was a rational basis for allocating PPE to janitors on those wings. The janitors on A and B wings were on the unit 100% of the time, had to clean surfaces used by infected inmates, and had to interact face-to-face with infected inmates by, for example, delivering meal trays. McGee, by contrast, was only on C wing for 5-7 minutes at a time, did not have to clean anything, and did not have to interact face-to-face with infected inmates to complete his job duties. Because supplies at the institution were limited at the time, the institution could not give everyone PPE, and they decided to allocate PPE for janitors in A and B wings who had more extensive and direct contact with the virus and infected inmates.

In response, McGee has not identified any specific evidence genuinely disputing these facts or otherwise showing discriminatory intent. He simply disagrees with the reason given for the decision to allocate PPE to janitors in A and B wings. Based on this record, no reasonable jury
12

could find invidious discrimination. Defendants are therefore entitled to summary judgment on the Fourteenth Amendment claim and the Court will dismiss this case.

## CONCLUSION

For the reasons stated above, **IT IS HEREBY ORDERED** that Plaintiff's motion for extension of time (Dkt. No. 51) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment (Dkt. No. 42) is **GRANTED**; Plaintiff's motion for summary judgment (Dkt. No. 53) is **DENIED**; and the case is **DISMISSED**. The Clerk's office shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin on February 17, 2023.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.